CHRIS NELSON, Appellee, v. CONROY SAVINGS BANK, Appellant.

**TRUSTS: Constructive Trusts—Notice of Equitable Right.**  An owner of goods who sells to an insolvent under an agreement that he will be paid from the proceeds of a resale of the goods may follow said proceeds into the hands of anyone who takes with full notice of the equitable right of the unpaid seller.  Of course, he may enforce payment against one who receives the proceeds and contracts to make payment to the former owner.

**TRIAL: Motion to Strike—Effect of Order.** Answers which are for-
2  mally stricken from the record because faulty in form will, never-
theless, be treated as remaining in the record, in so far as necessary
to give application and understanding to subsequent answers which
correct the form.

**BILLS AND NOTES: Presentment—When Excused.** Failure to present
3  a check for payment will be excused when the action is not strictly
*on* the check, and when such presentation would manifestly have
been a futile act.

**CONTRACTS: Consideration—Sufficiency.** An agreement by a bank
4  to pay a claim from a certain deposit if such deposit is made in
said bank is supported by ample consideration.

**APPEAL AND ERROR: Decision in General—Ruling Refused.** What
5  relief will be given a party who has appealed from an order by
the trial court refusing to rule on submitted matters of a material
nature, *quaere.*

*Appeal from Iowa District Court.*—RALPH OTTO, Judge.

MAY 15, 1923.

REHEARING DENIED SEPTEMBER 22, 1923.

ACTION at law, predicated upon an alleged oral agreement
by the defendant to pay the plaintiff the purchase price of a
certain shipment of hogs, the proceeds of the resale of which
were to come into the hands of the defendant. The alleged
promise of the defendant was made to one Herman Olson, for
the benefit of plaintiff. The proceeds of resale did come into
the hands of the defendant, and were thereafter withheld by
the defendant and appropriated by it to other uses in its own
behalf. The defense was a general denial and a further aver-
ment that the alleged agreement was without consideration, and
that the alleged proceeds received by the defendant were so re-
ceived as the property of Herman Olson, and were applied by
the defendant upon the obligations owed by said Olson to the
defendant. There was a verdict for the plaintiff, and defendant
appeals.—*Affirmed on condition.*

*Havner, Hatter & Harned* and *P. P. White,* for appellant.

*B. L. Wick* and *J. M. Dower,* for appellee.

EVANS, J.—The larger merits of the case are quite apparent; but the details of the record of the trial are very confusing and unsatisfactory. The evidence indicates that the plaintiff had a better case than he pleaded, and that the case pleaded by him was not as clearly proved as the case which he did not plead.

The jury could have found from the evidence substantially the following facts: Herman Olson was an insolvent stock buyer, doing business in and about the little railroad station

1. TRUSTS: con- of Conroy, in Iowa County. The defendant was
structive trusts: engaged in the banking business in the same
notice of equi-
table right. village. Conroy is an unincorporated village of about 75 people. Its inhabitants, therefore, are not strangers to each other. The defendant was the only bank in the place. Its president was the grain buyer at the same station. Herman Olson lived on a rented farm close by the village; likewise, the plaintiff. On March 13, 1920, Olson purchased hogs from three of the near-by residents: Chris Nelson (plaintiff), Art Jacobs, and Russell Spurrier. These purchases were just enough to make up a carload, and were purchased for that purpose. They were delivered, and shipped to Chicago the same day. The purchase price to each of the sellers was: $1,851 to Nelson (plaintiff), $830 to Art Jacobs, and $256 to Russell Spurrier. Olson delivered to the plaintiff his check for $1,851, drawn on the Peoples Savings Bank of Marengo. Olson had no funds on deposit, to meet this check. His intention was to have the proceeds of the resale of the hogs in Chicago remitted to the Peoples Savings Bank, for the purpose of meeting this check and the others, and to arrange with the bank to receive these proceeds and to pay the same to these check holders. He did immediately thereafter call up the bank at Marengo and make such an arrangement, which arrangement, however, involved no undertaking by the bank to do more than to pay said checks *pro tanto* out of the proceeds which should be actually deposited with it. This arrangement was acceded to by Nelson, who agreed to withhold his check from presentation for the few days necessary for the returns from Chicago which should put such proceeds at the disposal of the Peoples Savings Bank. Shortly thereafter, and on the same afternoon, and without the knowledge of Nelson,

Olson entered into an arrangement with the defendant bank, whereby the proceeds of such resale should be remitted to the defendant bank, instead of to the Peoples Savings Bank. A letter of instructions was prepared by the defendant's cashier and signed by Olson and mailed to the commission house of the Chicago stockyards to which the shipment of hogs was billed. Pursuant to this letter of instruction, all the proceeds of the shipment were remitted to the defendant. The defendant thereupon denied any obligation to the plaintiff to pay to him any part of the proceeds of such resale. It recognized, however, its obligation to Spurrier and to Jacobs, and paid to each of them the full amount due him from Olson. It claimed the right to apply the balance upon a pre-existing debt owed to it by Olson. The defendant, through its cashier, denied that it had ever agreed to pay any part of the proceeds to plaintiff. The issue of fact at this point is the crux of the case, and the grounds of reversal urged by appellant are directed to it.

It will be readily observable from the foregoing statement that the arrangement between Olson and the plaintiff whereby plaintiff was to be paid out of the proceeds of the resale through the medium of the Peoples Savings Bank was valid, as between the parties, and that it was enforcible in equity, not only as against Olson, but as against any third party who had notice of the same before parting with valid consideration upon the faith of Olson's apparent ownership of the funds. A court of equity would sequester such fund and apply it in accord with the agreement, or would require the depositary to so apply it. In such a case, it would not be essential to show that the depositary *agreed* to so pay it. It would be enough to show that he received it with notice of plaintiff's equitable right therein. This is the cause of action which plaintiff did not plead. The insolvency of Olson was a material element thereof. The plaintiff proved such insolvency, but did not plead it, nor did the petition predicate anything thereon as a ground of relief. The importance now of the disclosure of these facts by the record is their value as circumstances bearing upon the quantum of proof. The petition of the plaintiff predicated its ground of recovery upon the express agreement of the cashier of the defendant bank. It was for this reason, and this alone, that it became

necessary for the plaintiff, as an essential element of his pleaded case, to prove such agreement. It is the most vulnerable point, upon the record, in plaintiff's case, and appellant has directed to it its chief attack. We give our first consideration, therefore, to the ground of reversal predicated upon the alleged lack of proof.

I.   Appellant urges as a ground of reversal that there was no evidence of such agreement. The alleged agreement was not made with plaintiff, but with Olson, for the benefit of plaintiff. The defendant was represented by its cashier.

2. TRIAL: motion to strike: effect of order.   The cashier, as a witness, denied the agreement. The plaintiff had no personal knowledge of the agreement, and could not, therefore, testify. He used Olson as a witness. The record discloses the following examination of Olson:

(1)   "Q. Then, after that talk over the phone between John and the Peoples Bank, what was the talk between you and John concerning this matter, as to turning the funds through this bank or changing them to the Conroy Bank? A. Why, he was to take care of them checks, if I had the returns come in there. (Moved to strike out the answer, as the opinion and conclusion of the witness, and incompetent. Motion sustained.)"

(2)   "Q. What was said, if anything, there in this same connection, about his arranging then or agreeing to pay the Spurrier check and the Jacobs check? What was said in regard to that then? (Objected to as calling for the opinion or conclusion of the witness, and incompetent. Overruled. Defendant excepts.) A. Well, he was to take care of them checks when the returns came in. (Moved to strike out the answer as being the opinion or conclusion of the witness, and incompetent. Motion sustained.)"

(3)   "Q. You say he said then the understanding was he was to take care of 'them checks,'—what checks do you refer to? (Objected to, as basing the question upon a question and answer that was hearsay and incompetent and the opinion and conclusion of the witness, and calling for hearsay and incompetent testimony. Overruled. Defendant excepts.) A. Russell Spurrier's check and Art Jacobs' and Chris Nelson's check. (Moved to strike out the answer of the witness, as being the

opinion or conclusion, and based upon a question which calls
for the opinion or conclusion of the witness as to what was
agreed to, and not a statement of the facts.    Overruled.    De-
fendant excepts.)''

We have numbered the foregoing interrogatories for our
own convenience of reference.    The point now urged by appel-
lant is that the answer to Interrogatory 3 should have been
stricken and the objection to the question should have been sus-
tained because each was predicated upon the stricken answer to
Interrogatories 1 and 2.    This was not the objection made in
the court below, as will be noted.    So far as the objection ac-
tually made below is concerned, it was within the legitimate
discretion of the trial court to permit both the question and the
answer.    Whether the previous rulings of the court had the
effect to nullify the answer of the witness presents a somewhat
different question, which, perhaps, we ought not to evade, even
though it goes beyond the grounds of the objection as made in
the court below.    If the court had not sustained the motion to
strike the answers to Questions 1 and 2, the question of the suf-
ficiency of the evidence to go to the jury would not be debatable.
But the motions were formally sustained.    Notwithstanding such
ruling, Question 3 and the answer thereto were predicated on
the preceding answer.    Appellant argues, in effect, therefore,
that the very foundation of question and answer No. 3 was
eliminated from the record, and that such question and answer
were, therefore, left suspended, as it were, in mid-air.    This
argument puts too technical a construction upon the preceding
rulings of the court.    The answers were not necessarily elimi-
nated from the record by the adverse rulings of the court.    Their
form was disapproved, and they were rejected on such ground.
They were subject to amendment by appropriate interrogation
of the witness.    This was what was attempted by question and
answer No. 3.    The fact that the ruling on answer No. 3 might
be deemed inconsistent with ruling on answers Nos. 1 and 2
is not available to the appellant.    The trial court was not bound
by his previous rulings.    It was his right to change his mind,
and his duty to do so, if further reflection convinced him of
his previous error.    The fact that a later ruling by the court
is inconsistent with a former one creates no presumption of

error in the latter. As between a former and a later contradictory ruling, the later one should be deemed controlling, rather than the former. These three rulings must be considered together. The particular defect of form in the first two answers which invited the court's adverse ruling is not indicated in the record, except as it may be deduced from the ruling on the answer to No. 3. In the first two answers, the witness had used the indefinite term "them checks." The third answer specified the checks referred to. With this specification, the court deemed the answer proper. What appears in the record as three separate answers was, in fact, but one. Answers 1 and 2 were identical in terms. Answer 3 was a specification of "them checks." It was an amendment and amplification of the previous answer, and, in that form, such answer was deemed admissible. The ruling was within the fair discretion of the trial court. The court was justified in believing that the witness was a reluctant one. This, of itself, would justify considerable latitude in the examination, both as to question and answer.

The foregoing comprises the only direct evidence produced by plaintiff in support of the alleged agreement. It may be conceded that it was not strong. It was, nevertheless, sufficient to go to the jury, even though it stood alone. But it did not stand alone. It had the corroboration of very persuasive circumstances. Some of these have already been referred to. Though the cashier denied the agreement for the benefit of plaintiff, he admitted the agreement for the benefit of Jacobs and Spurrier. He paid to them the amount that was due them. No reason is suggested in his evidence why he should differentiate among the three sellers of hogs.

Moreover, a diversion of these proceeds from the channel which had been already promised by Olson, and which was relied on by plaintiff as the method by which he was to obtain payment for his hogs, would have been a fraud on Olson's part upon plaintiff, unless the change was attended with an equivalent agreement on the part of the Conroy bank that the defendant would devote such proceeds of the resale to the payment of the purchase price. What was done by Olson in the diversion of such funds was actually participated in by the cashier of the defendant. He knew of Olson's insolvency and of plain-

tiff's equitable right to be paid out of the proceeds of the resale. He knew also that Olson claimed to have made his arrangement with the Peoples Savings Bank for such protection of the sellers. If, therefore, Olson fraudulently diverted these proceeds into the hands of the defendant bank, the defendant's cashier actually participated in such fraud. The act of the diversion would be wholly purged of any fraud if the bank consented to receive the proceeds upon the same terms and conditions as the Peoples Savings Bank was to have received them. The inference was permissible to the jury that no fraud was intended, either by the cashier or by Olson, and that the direction to remit the proceeds to the defendant bank was intended to be the equivalent of the previous arrangement with the Peoples Savings Bank, so far as the sellers of the hogs were concerned. We reach the conclusion, therefore, upon the whole record, that the evidence was not only sufficient to go to the jury, but that, in all its circumstances, it was very persuasive.

II.   It appears that the plaintiff never presented his check for payment at the defendant bank. It is argued that he thereby waived and forfeited his right to any recovery from the bank. 3. BILLS AND NOTES: presentment: when excused.   This contention is predicated upon the law merchant, and much authority is cited to us on the subject of acceptance and presentation, etc. At the time of the arrangement for the remitting of the proceeds to the defendant bank, plaintiff had already received his check from Olson on the Peoples Savings Bank, and had gone home. This was on Saturday. On Wednesday, he presented his check at the Peoples Savings Bank. Prior to this time, he had no knowledge of any change of plan on the part of Olson. He called at the defendant bank and interviewed the cashier, who disclaimed all obligation to him. The check held by plaintiff was not a check on the Conroy bank. He never obtained any check on the Conroy bank. In view of the defendant's prompt repudiation of any obligation to the plaintiff, we do not think that he was under any burden of further formality, either to obtain a new check from Olson or to formally present the old one. Defendant's own attitude was a declaration that such a course would be futile. This action is not upon the check. It is an action upon a contract and upon a promise to pay. The

defendant never predicated its refusal to pay upon the ground thus urged as a present defense. It was not, in fact, a ground of its refusal. It claimed the right to appropriate the money to the payment of its own pre-existing obligation, and it now claims to have done so. Such was its pleading. We find no merit in this point.

III. The appellant pleaded that the alleged agreement was without consideration, and the point is strongly urged in argument. It is not tenable. The obligation of the defendant to pay was subject to the condition precedent that the proceeds of the resale should be remitted to the defendant. Until the performance of such condition, the defendant was under no obligation to pay. The condition was performed, and defendant received such proceeds and still holds the same. This was not only a consideration, but it was an adequate one. The receipt of these proceeds by the defendant answers also the argument that the contract was within the statute of frauds, which is now urged in argument, though it was not put forth at the trial, either by pleading or by objections to evidence.

4. CONTRACTS: consideration: sufficiency.

We do not overlook that there is one incongruity in the verdict. The verdict rendered was for the full amount of Nelson's sale price. The agreement pleaded by the plaintiff was that the defendant would pay him only to the extent of the proceeds of resale which would come into its hands. The proceeds of resale remitted to the defendant were somewhat less than the sum total of the purchase price agreed to be paid by Olson to the sellers. Such sum total was $2,937.58. The amount of proceeds remitted to the defendant bank was $2,850. The defendant had paid, out of such proceeds, to Jacobs and Spurrier the sum of $1,086.58. This left in its hands, subject to the demand of plaintiff, the sum of $1,763.42. This was the measure of defendant's remaining liability to the plaintiff, as of the date of its receipt of the remittance.

IV. One peculiarity of the record is that the defendant has a double appeal. The defendant duly filed and caused to be submitted, after verdict and judgment, three motions: one in arrest of judgment; one for judgment *non obstante;* and one for a new trial.

5. APPEAL AND ERROR: decision in general: ruling refused.

These motions, though duly submitted to the court, were not ruled upon, up to the date of the expiration of the time for taking an appeal to this court. On the last day of such period, the defendant perfected its appeal from the judgment. Thereafter, the trial court entered an order refusing to rule upon the motions, because its jurisdiction had been ousted by the appeal. From such order also the defendant has appealed. The motions referred to had their importance to the defendant. As to some of the questions presented, it would be at least doubtful whether defendant was entitled to a consideration thereof, without having first raised the same by motion below. That the trial court owes to the litigant the duty to rule upon such motions with reasonable promptness, and before the expiration of the time of appeal, is not only to be conceded, but should be solemnly declared. In view of the conclusion which we have reached upon the decisive question in the case, it becomes unnecessary for us to determine what relief we ought to extend to the appellant because of the failure of the court to rule upon its motions. It presents a situation not foreseen by the legislature. No legislative provision is made for it. The necessity for future legislation thereon could only be predicated upon the assumption that trial judges would neglect their duty in this regard. The question has never confronted us before, and we venture to hope that it will never confront us again. We shall assume, for the present, that there was some unusual reason for the present lapse which might have been disclosed if the trial judge had any voice in the appeal.

In view of our conclusion upon the controlling features of the appeal, the appellant has not been prejudiced in its standing here by reason of its failure to get a timely ruling on its motion.

The judgment below will be affirmed only to the extent indicated in Division III hereof, and on condition that the plaintiff will remit the excess, as therein indicated.—*Affirmed on condition; otherwise reversed.*

PRESTON, C. J., STEVENS and DE GRAFF, JJ., concur.